# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-2042
_____

Lucas Hernandez

*Plaintiff - Appellee*

v.

Bridgestone Americas Tire Operations, LLC

*Defendant - Appellant*

_____

No. 15-2428
_____

Lucas Hernandez

*Plaintiff - Appellant*

v.

Bridgestone Americas Tire Operations, LLC

*Defendant - Appellee*

_____

Appeals from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: February 10, 2016
Filed: August 4, 2016[1]
[Published]
_____

Before SHEPHERD, BEAM, and KELLY, Circuit Judges.[2]

_____

PER CURIAM.

Bridgestone Americas Tire Operations, LLC (BATO) appeals the district court's grant of summary judgment in favor of Lucas Hernandez on his Family Medical Leave Act (FMLA) interference claim. The district court held that absences for overtime shifts should not have been deducted from Hernandez's FMLA entitlement because the overtime shifts were voluntary and thus, not included in his FMLA allotment. Hernandez cross-appeals the district court's ruling on attorneys' fees and expenses. In response to Hernandez's motion seeking $113,586 in attorneys' fees and expenses, the district court reduced the award to $76,318. For the reasons discussed below, we remand for further consideration of the request for costs for computerized legal research (CLR) and affirm in all other respects.

I.      BACKGROUND

BATO designs, manufactures, and sells tires for a wide variety of applications in a number of North American manufacturing facilities. BATO hired Hernandez in

_____

[1]This court filed its opinion on May 13, 2016, and a petition for rehearing was filed on May 27, 2016. The petition for rehearing is granted and the opinion filed May 13, 2016, is vacated and this opinion is substituted.

[2]This opinion is being filed by Judge Shepherd and Judge Kelly pursuant to 8th Cir. Rule 47E.

2003 as an hourly production worker. In 2004, Hernandez became a tire builder; he held this position until he was terminated in August 2012. BATO has an attendance program for all hourly employees that was negotiated with the Union and incorporated into the collective bargaining agreement (CBA). When an employee fails to report for a shift, regular or overtime, it is considered an "incident of absence." When an employee is unable to work, he or she must notify plant security, and the guard then records the employee's reported reason for the absence on a call-off log. BATO's attendance program follows a progressive discipline program. After five incidents of absence in a nine-month period, the employee is required to attend counseling. If an additional incident of absence occurs after counseling and within nine months of the previous incident, the employee is issued a written warning (Step 1). If an additional incident of absence occurs after the written warning and within nine months of the previous incident, the employee receives a written reprimand (Step 2). If an additional incident of absence occurs after the written reprimand and within nine months of the previous incident, the employee receives a final written warning (Step 3). If an additional incident of absence occurs after the final written warning and within nine months of the previous incident, the employee is terminated (Step 4). At each step of the discipline process the employee and Union may provide documents or information to explain the absence. An absence will be excused for approved FMLA leave, accident and sickness leave, jury duty, and bereavement.

Work schedules for hourly production employees are published in October and do not change throughout the year. Employees have the same schedule from November 1 through October 31 of the following year. Because BATO requires continuous manufacturing operations, overtime shifts are often necessary. Overtime is based on the plant's staffing and production needs, and the overtime selection process is controlled by the CBA. When overtime is needed, BATO posts an overtime sign-up sheet in the department. Tire builders are then allowed to indicate their interest and availability on the overtime sheet. BATO selects employees from the list based on seniority and the number of overtime hours an employee has worked in that

year. The list of selected tire builders is then posted in the department. Employees are required to check the list and if selected, are required to be present and work the twelve-hour shift unless allowed to leave early due to diminished production. If an employee fails to report for an overtime shift, he is subject to discipline under the attendance program unless the absence is excused. If the employee misses for an FMLA-qualifying reason, the twelve-hour overtime shift is deducted from the employee's FMLA entitlement.

During orientation, all employees are notified of their rights under the FMLA. Human Resources makes all decisions regarding FMLA leave. When an employee needs FMLA leave, he fills out a form to request leave and is notified of his rights under the FMLA. In July 2010, Hernandez requested and was approved for intermittent FMLA leave to care for his son who suffers from asthma. In November 2011, he requested additional intermittent FMLA leave. Human Resources based Hernandez's FMLA leave on his fixed work schedule as a tire builder. He was scheduled to work twelve-hour shifts and forty-two-hour workweeks.[3] A forty-two-hour workweek gave Hernandez 504 hours of FMLA leave beginning in November 2011.

Between October 31, 2011, and July 15, 2012, Hernandez missed work fifty-four times. Six of those absences were overtime shifts. Forty-two of the missed days were excused under the attendance program as FMLA leave or accident and sickness leave. Six absences were unexcused, which resulted in counseling under BATO's attendance program. He had another non-FMLA, unexcused absence on January 13, 2012, for which he progressed to Step 1 of BATO's attendance program and received a written warning. Hernandez exhausted his 504 hours of FMLA leave on July 10, 2012. He then missed two overtime shifts on July 11, 2012, and July 12, 2012, for

---

[3]Hernandez was scheduled for three twelve-hour shifts one week (thirty-six hours) and four twelve-hour shifts the next week (forty-eight hours). BATO pays employees who work this schedule for forty-two hours of work each week.

-4-

FMLA-qualifying reasons. However, because Hernandez had exhausted all of his FMLA leave on July 10, 2012, the July 11 and July 12 absences counted as unexcused absences under the attendance program. Hernandez contacted the Human Resources Manager, Samantha Peterson, to notify her that he missed work to care for his son. She informed him that he had exhausted his FMLA leave on July 10. Peterson followed up with Hernandez regarding his FMLA leave in a formal letter dated July 17, 2012.

Because of the July 11 and July 12 absences, Hernandez progressed to Step 2 and Step 3 of the attendance program, receiving both a written reprimand and a final written warning. He chose not to file grievances over any of these absences or the resulting discipline. Hernandez failed to report for his regular shifts on July 13 through July 15 and thus, advanced to the final step of BATO's attendance program, termination. On August 2, 2012, Hernandez and a Union representative met with Jeff Higgins, the plant's Labor Relations Manager. At the meeting, Hernandez submitted a doctor's note from July 25 stating that he missed work on July 9 through 15 to care for his son. In accordance with the CBA, Hernandez returned to work on August 6, 2012, after an Article 12 cooling-off period. BATO reviewed Hernandez's file and Jim Funcheon, BATO's Division Human Resources Manager, terminated Hernandez because he had progressed through all the steps of the attendance program. Hernandez then filed a grievance challenging his termination but failed to pursue the grievance to arbitration.

Hernandez filed a petition in Iowa state court on May 8, 2013, claiming BATO violated his rights under the FMLA. BATO removed the case to federal district court, and both parties filed motions for summary judgment. The district court ruled in favor of BATO on Hernandez's FMLA discrimination, retaliation, and harassment claims, but ruled in favor of Hernandez on his FMLA interference claim. The court held that absences for missed overtime shifts should not have been deducted from Hernandez's FMLA entitlement because he initially volunteered for the sporadic overtime.

Moreover, because BATO treated Hernandez's occasional overtime as voluntary for purposes of calculating his FMLA-leave allotment, it must also treat the overtime hours as voluntary for purposes of deducting hours from his FMLA entitlement. A jury trial on damages for the FMLA interference claim resulted in an award of $75,681. Hernandez also received liquidated damages and reinstatement. He then filed a motion seeking $105,662 in attorneys' fees and expenses, and later filed a motion for supplemental attorneys' fees and expenses requesting an additional $7,924, for a total of $113,586 in attorneys' fees and expenses. The district court reduced the fee award to $76,318. BATO now appeals the district court's decision to grant Hernandez summary judgment on the FMLA interference claim. Hernandez cross-appeals regarding attorneys' fees and expenses.

## II.    DISCUSSION

We review the district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party. Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1001 (8th Cir. 2012). A grant of summary judgment is only proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. (quoting Fed. R. Civ. P. 56(a)). We also review federal statutes, like the FMLA, de novo. Breneisen v. Motorola, Inc., 656 F.3d 701, 704 (7th Cir. 2011). The abuse-of-discretion standard, however, is used when reviewing a district court's award of attorneys' fees and expenses. Marez v. Saint-Gobain Containers, Inc., 688 F.3d 958, 965 (8th Cir. 2012).

Under the FMLA, which Congress adopted "to balance the demands of the workplace with the needs of families," 29 U.S.C. § 2601(b)(1),"an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period" for certain reasons, such as the need to care for a child. Id. § 2612(a)(1)(C). FMLA leave to care for a child "may be taken intermittently or on a reduced leave schedule when medically necessary." Id. § 2612(b)(1). It is "unlawful for any employer to *interfere*

*with*, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the statute]."  Id. § 2615(a)(1) (emphasis added).  To succeed on an FMLA interference claim, Hernandez must prove the following:  "(1) [Hernandez] was an eligible employee; (2) [BATO] was an employer as defined by the FMLA; (3) [Hernandez] was entitled to FMLA leave; (4) [Hernandez] gave [BATO] notice of his intent to take FMLA leave;  and (5) [BATO] denied [Hernandez] FMLA benefits to which he was entitled."  Beatty v. Custom-Pak, Inc., 624 F. Supp. 2d 1045, 1052 (S.D. Iowa 2009).  Only the last element of the claim is disputed.

## A.     Voluntary Versus Mandatory Overtime

To determine whether BATO denied Hernandez FMLA benefits by deducting missed overtime hours from his FMLA entitlement, we must first decide whether the overtime was voluntary or mandatory.  BATO argues that the district court erred in holding that Hernandez's overtime was voluntary, claiming specifically that the district court misapplied 29 C.F.R. § 825.205(c).  We agree.

Under the federal regulations "[v]oluntary overtime hours that an employee does not work due to an FMLA-qualifying reason *may not* be counted against the employee's FMLA leave entitlement."  29 C.F.R. § 825.205(c) (emphasis added). Conversely, "[i]f an employee would normally be required to work overtime, but is unable to do so because of a FMLA-qualifying reason that limits the employee's ability to work overtime, the hours which the employee would have been required to work may be counted against the employee's FMLA leave entitlement."  Id. Thus, the crux of the issue is the definition of "voluntary."  BATO argues that its overtime selection process makes overtime shifts, which begin as voluntary, mandatory after BATO selects employees for the shifts.  BATO posts a sign-up sheet, and employees indicate their interest in, and availability to be selected for, overtime.  BATO then selects employees to work.  After the selection is made, employees are *required* to be present and work the shift.  Failing to report for an overtime shift, just like a regular

-7-

shift, counts as an incident of absence under BATO's attendance policy. Hernandez argues that the overtime shifts are voluntary because (1) employees volunteer for the shifts, implying that the shifts are not mandatory for employment, and (2) the shifts are not part of the employee's normal workweek.

Case law suggests that the particular overtime selection process used by the employer can make originally voluntary overtime shifts mandatory. Mann v. Frank, 7 F.3d 1365 (8th Cir. 1993), involved a Seventh Day Adventist who could not work on Fridays or Saturdays because of her religion. To be assigned overtime, the employees signed up on an "Overtime Desired List." Id. at 1367. When overtime work was needed, the employer picked a person from the list based on the skills required for the position. Id. Mann placed her name on the list, and when an overtime shift was needed she was selected from the list as the only employee on the list with the necessary skills. Id. at 1367-68. However, the shift fell on a Friday and Saturday. Id. at 1368. She did not show up for the shift and was suspended for seven days without pay for being "absent without leave." Id. This court dismissed her discrimination claim, implying that once selected from an overtime list on which an employee voluntarily places her name, the employee must work or be subject to discipline. Id. at 1370. The sign-up process made the originally voluntary overtime shifts mandatory.

The district court relied on Mays v. American Electric Power, No. 2:08-cv-1124, 2010 WL 3667006 (S.D. Ohio 2010), belaboring the point that Mays, unlike Hernandez, was *required* to work a certain amount of overtime, which made it acceptable to deduct missed hours from Mays's FMLA entitlement. Id. at *1, *10. However, Mays also stands for the proposition that certain overtime hours were only mandatory once the employee was selected. As part of Mays's job he had to work overtime and respond to calls after hours *if he was selected*. Id. at *1. The court held that the employer "correctly charged missed overtime hours to Plaintiff's FMLA leave" because without an FMLA-qualifying reason for the absence, he would have

been expected to work.  Id. at \*10.  For Mays, overtime was a regular part of his job *when and if* he was selected; thus, the court considered Mays's overtime mandatory. Although the overtime selection process in Mays differed from that at BATO, in both situations selection for overtime was a prerequisite to the employee being required to work the shift.  Thus, both Mann and Mays suggest that even if overtime is not consistent or included in the employment contract, mandatory overtime can be implied by custom or procedure.

In finding that Hernandez's overtime was voluntary, the district court also relied heavily on a 1999 opinion letter from the Department of Labor (DOL).  The letter states:

> If overtime hours are on an "as needed basis" and are not part of the employee's usual or normal workweek, or is voluntary, such hours would neither be counted to calculate the amount of the employee's FMLA leave entitlement nor charged to the employee's FMLA leave entitlement.  Where overtime hours are not part of the employee's usual or normal workweek, disciplinary action may not be taken against an employee for being unable to work overtime as a result of limitations contained in a medical certification obtained for FMLA purposes.

Opinion Letter Family Medical Leave Act, FMLA-107, 1999 WL 1002421, at \*1 (July 19, 1999) [hereinafter Opinion Letter].  This opinion stresses that voluntary is a synonym for "not part of the employee's usual or normal workweek."  This is an agency's interpretation of its own regulation and thus informs our analysis.  We defer to the agency's opinion contained in *any* agency document, even something with as little precedential value as a DOL legal brief.  Talk America, Inc. v. Mich. Bell Tel. Co., 131 S. Ct. 2254, 2261 (2011).  Like the district court, we agree with the opinion's definition of voluntary.  However, we depart from the district court in applying the definition to the facts of this case.  Here, it is clear that BATO did not require Hernandez to work a specified amount of overtime.  He had the option to choose overtime shifts if he so desired.  Thus, overtime was not part of his regular workweek.

However, if Hernandez signed up and was selected for overtime, he was then required to work unless he had an excuse. The selected overtime shift became mandatory and was treated as a part of Hernandez's "usual or normal workweek."

Finally, the DOL's Final Rule, published before the adoption of 29 C.F.R. § 825.205(c), provides further insight into the meaning of "voluntary." The Final Rule states, "The Department agrees that the appropriate focus is whether the employee would have been required to work the overtime hours *but for* the taking of FMLA leave . . . ." The Family Medical Leave Act of 1993, 73 Fed. Reg. 67934-01, 67979 (Nov. 17, 2008) [hereinafter Final Rule] (emphasis added). If the employee would have been required to work, the overtime is mandatory. Id. Had Hernandez not taken FMLA leave, he would have either been required to work the overtime hours he signed up for or been disciplined. The fact that BATO disciplines employees for missed overtime shifts, just like missed regular shifts, further illustrates that once the employee is selected for the shift, he is required to work. At BATO, failing to work an assigned shift is considered an incident of absence, which is recorded on the employee's record. Thus, according to the Final Rule, Hernandez's overtime was mandatory.

Based on BATO's overtime procedure, case law, and the statutory language, legislative history, and implementing regulations of the FMLA, we conclude that Hernandez's overtime hours were mandatory. Therefore, hours missed for FMLA-qualifying reasons were correctly deducted from Hernandez's FMLA leave entitlement.

-10-

## B.     FMLA Entitlement

BATO was correct to treat overtime as part of Hernandez's usual or normal workweek and deduct missed shifts from his FMLA leave.  However, because the overtime was mandatory, Hernandez's overtime hours should have also been included when calculating his total FMLA-leave allotment. Opinion Letter, 1999 WL 1002421, at *1.  BATO's failure to do so "denied [Hernandez] FMLA benefits to which he was entitled."  Beatty, 624 F. Supp. 2d at 1052.

The DOL intended for hours missed for FMLA-qualifying reasons to be deducted from the employee's FMLA-leave entitlement *only if* those hours were included in the employee's leave allotment.  See Final Rule, 73 Fed. Reg. at 67979. The Final Rule before § 825.205(c) was promulgated expresses this desire, stating:

> The Department points out that overtime is factored into the FMLA entitlement because both the entitlement and the leave usage rate are based on the employee's required (i.e., scheduled) hours of work.  The Department believes it is fair, therefore, that overtime not worked be counted against the FMLA entitlement when the employee would have been required to work the overtime hours but for the use of FMLA leave.

Id.  Mandatory overtime, or overtime that is a part of the employee's normal workweek, is to be included in the calculation of FMLA leave "even where the employer may not know in advance of the workweek when overtime will be scheduled or how much overtime will be worked that week."  Opinion Letter, 1999 WL 1002421, at *1.

Because the district court decided that Hernandez's overtime was voluntary, it did not discuss the consequences that would have resulted if it had concluded, as we now conclude, that the overtime was mandatory. The district court did, however, note the inconsistency between the allegedly mandatory overtime and the amount of

overtime hours Hernandez received. The district court correctly stated, "After treating plaintiff's occasional overtime shifts as 'voluntary' for purposes of calculating the allotment, however, BATO cannot then choose to treat them as [anything] other than 'voluntary' under § 825.205(c)." The converse of that statement is also true. We hold that BATO's overtime selection process made the overtime mandatory. Thus, instead of holding that "BATO inappropriately deducted from plaintiff's annual allotment for scheduled overtime shifts plaintiff missed due to an FMLA-qualifying purpose," as the district court held, we now hold that BATO interfered with Hernandez's rights under the FMLA by improperly calculating his FMLA-leave entitlement.

In regards to the FMLA-leave calculation, the district court incorrectly opined that "[b]ecause defendant could not have contemplated plaintiff's overtime hours with any degree of certainty, it correctly declined to account for those hours in plaintiff's annual FMLA allotment." Even when an employee's schedule is inconsistent, the FMLA provides a method for calculating the correct amount of FMLA leave so that deducting missed overtime hours from the employee's FMLA leave entitlement is fair to both the employee and the employer. 29 C.F.R. § 825.205(b)(3). The FMLA calculates leave for employees with varying schedules as follows:

> If an employee's schedule varies from week to week to such an extent that an employer is unable to determine with any certainty how many hours the employee would otherwise have worked (but for the taking of FMLA leave), a weekly average of the hours scheduled over the 12 months prior to the beginning of the leave period (including any hours for which the employee took leave of any type) would be used for calculating the employee's leave entitlement.

Id. Given that Hernandez's overtime hours varied from week to week, BATO should have calculated Hernandez's FMLA leave in accordance with § 825.205(b)(3). Instead, Hernandez's overtime hours were not considered at all. By scheduling mandatory overtime hours that were not included in Hernandez's FMLA-leave

-12-

allotment and yet were deducted from his FMLA entitlement when he missed an overtime shift, "[BATO] denied [Hernandez] FMLA benefits to which he was entitled." Beatty, 624 F. Supp. 2d at 1052.

## C.    Attorneys' Fees and Expenses

### 1.

Hernandez cross-appeals arguing that the district court erred in reducing attorneys' fees and expenses. First, Hernandez claims that the district court erred when it reduced Hernandez's recoverable fees for lack of success on some of his claims. We disagree. "When a plaintiff has prevailed on some claims but not on others, the plaintiff may be compensated for time spent on unsuccessful claims that were related to his successful claims, but not for time spent on unsuccessful claims that were 'distinct in all respects from his successful claims.'" Emery v. Hunt, 272 F.3d 1042, 1046 (8th Cir. 2001) (quoting Hensley v. Eckerhart, 461 U.S. 424, 440 (1983)). The district court held that Hernandez brought three separate claims but found that the three claims shared core facts. Thus, the court decreased Hernandez's attorneys' fees by only 20% instead of the 50% BATO requested. The standard for reviewing an award of attorneys' fees is "abuse of discretion," Marez, 688 F.3d at 965, and thus, the court "necessarily has discretion" to "reduce the award to account for the limited success." DeGidio v. Pung, 920 F.2d 525, 533 (8th Cir. 1990) (quoting Hensley, 461 U.S. at 436-37). Accordingly, the district court did not abuse its discretion in reducing Hernandez's fee request by 20%.[4]

---

[4]The district court's order states that it "decrease[d] Plaintiff's attorneys' fees by 20%." However, the district court first reduced Hernandez's requested fee of $113,586 by $4,560 due to excessive expenses, leaving $109,026. It then directed judgment for attorneys' fees and expenses in the amount of $76,318, which is a 30%, not 20%, reduction reflecting Hernandez's limited success.

**2.**

Second, Hernandez argues that the district court erred when it reduced his recoverable expenses by 20%. We disagree. The district court found that scanning costs were noncompensable, administrative costs should have been included in the firm's overhead, and the law firm charged excessive law clerk fees. The district court gave a well-articulated reason for its reduction in expenses. Thus, there was no abuse of discretion.

**3.**

Third, Hernandez argues that the district court erred when it excluded costs for CLR. The district court relied on Leftwich v. Harris-Stowe State College, 702 F.2d 686, 695 (8th Cir. 1983), where we held "that computer-aided research, like any other form of legal research, is a component of attorneys' fees and cannot be independently taxed as an item of cost in addition to the attorneys' fee award." More recently, however, we recognized that Leftwich was "decided when CLR was in its infancy." Ludlow v. BNSF Ry. Co., 788 F.3d 794, 804 (8th Cir. 2015). Quoting Missouri v. Jenkins, 491 U.S. 274 (1989), a United States Supreme Court case handed down after Leftwich was decided, we noted that "an award of reasonable attorney's fees may include litigation expenses if it is 'the prevailing practice in a given community' for lawyers to bill those expenses separately." Ludlow, 788 F.3d at 804–05 (quoting Jenkins, 491 U.S. at 287).[5] We then affirmed the district court's decision to allow

---

[5]In Jenkins, the Supreme Court allowed litigation expenses—in that case, paralegal and law clerk time—to be separately billed and charged to the losing party under a fee-shifting statute because it had become the "increasingly widespread custom of separately billing for [such] services." Id. at 286 (quoting Ramos v. Lamm, 713 F.2d 546, 558 (10th Cir. 1983)).

recovery of reasonable CLR costs, which was "consistent with prevailing practice in the [relevant legal community]." Id. at 805.[6]

CLR is now a common litigation expense, and it may be reimbursable. See In re UnitedHealth Group Inc. S'holder Derivative Litig., 631 F.3d 913, 918–19 (8th Cir. 2011) (noting "[t]he prevailing view among other circuits is to permit awards to reimburse counsel for the reasonable costs of online legal research"); see also Sturgill v. United Parcel Serv., Inc., 512 F.3d 1024, 1036 (8th Cir. 2008) (concluding district court had discretion to award attorney travel and private process server costs to prevailing party in Title VII case where such costs were incurred by attorney and normally would be charged to a fee-paying client). When billing such fees separately becomes "the increasingly widespread custom" in the relevant marketplace, district courts have the discretion to award them to the prevailing party under a fee-shifting statute. Jenkins, 491 U.S. at 286 (internal quotation marks and quotation omitted). More particularly, if the prevailing party demonstrates that separately billing for CLR is the "prevailing practice in a given community" and that such fees are reasonable, the district court may award those costs. Id. at 287. Because the district court in this case was of the view it lacked discretion to award costs for CLR at all, we remand for a determination of whether the expenses Hernandez incurred for CLR should be shifted to BATO.

---

[6]To the extent the conclusion in Leftwich that CLR costs are not reimbursible was based simply on the fact that the prevailing practice at the time it was decided was not to bill such costs separately, Ludlow explains that the prevailing practice has changed. Ludlow, 788 F.3d at 805. To the extent Leftwich imposed a categorical rule that CLR costs are not reimbursible, its reasoning is called into doubt following the Supreme Court's decision in Jenkins. See United States v. Anderson, 771 F.3d 1064, 1066–67 (8th Cir. 2014) (observing that we are not bound by a prior panel's ruling "when the earlier panel decision is cast into doubt by an intervening Supreme Court decision"). Either way, it is no longer an automatic abuse of discretion to shift CLR costs.

## III. CONCLUSION

We remand for further consideration of the request for costs for CLR and affirm the judgment of the district court in all other respects.

_____